IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. CCB-19-36 |
| | * | |
| GARY CREEK | | |

*******

**MEMORANDUM**

Now pending is the motion for reconsideration filed on behalf of Gary Creek seeking release from pretrial detention on the basis of changed circumstances, specifically the risk to Creek presented by the presence of COVID-19 at the facility where Creek is being held (the Correctional Treatment Facility ("CTF") in Washington, D.C.). Following an interlocutory appeal from this court's denial of the motion, and a remand order issued by the Fourth Circuit, additional information and supplemental briefing have been obtained. For the reasons set forth below, the court finds that Creek's risk from COVID-19, balanced against the other Bail Reform Act factors, rises to the level of a "compelling reason" for temporary release under 18 U.S.C. § 3142(i).

**BACKGROUND**

On December 5, 2019, Creek was indicted on charges of conspiracy to distribute over 280 grams of crack cocaine and conspiracy to possess firearms in furtherance of drug trafficking. (ECF 276). Creek initially was charged by complaint. (ECF 258). On November 27, 2019, following a hearing, Magistrate Judge Mark Coulson ordered Creek detained, finding by clear and convincing evidence that there were no conditions or combination of conditions that could reasonably assure community safety. Judge Coulson specifically cited the rebuttable presumption in favor of detention resulting from the drug charge, Creek's previous federal narcotics and gun

1

conviction,[1] the ammunition and drugs seized from Creek's home, text messages and jail calls tying Creek to the distribution of firearms, and Pretrial Services' recommendation in favor of detention. (ECF 274).

On March 18, 2020, Creek filed a motion for reconsideration, which was denied on March 24, 2020, (ECF 368), and another motion on March 26, 2020, which was denied on March 27, 2020, (ECF 370). He then filed an interlocutory appeal to the Fourth Circuit. On April 15, 2020, the Fourth Circuit issued a remand order, retaining jurisdiction over the appeal but directing this court in the first instance to consider "the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i)." (ECF 402). This court then ordered supplemental briefing, which was completed on April 27, 2020. Based on that briefing, the issues raised by the Fourth Circuit are addressed below.

## DISCUSSION

First is the severity of the risk that the COVID-19 virus poses to Creek. According to the letter opinion provided by Dr. Anthony Gerard,[2] the 39-year-old Creek has multiple medical conditions that put him at higher risk of serious illness or death if he contracts the COVID-19 disease. Dr. Gerard's estimate is that Creek is "is likely to have 3 to 5 times the risk of dying

---

[1] In 2010, Creek pled guilty to one count of conspiracy to distribute at least five kilograms of cocaine and 50 grams of crack cocaine, and one count of possession of a firearm in furtherance of a drug trafficking crime, in the U.S. District Court for the Eastern District of Pennsylvania. (No. CCB-13-585, ECF 1-2, Judgment in a Criminal Case). In October 2013, jurisdiction over Creek's supervised release was transferred to this court. (*Id.*, ECF 1, Transfer of Jurisdiction).

[2] Dr. Gerard is a family physician with 30 years of clinical experience, and an Assistant Clinical Professor of Family Medicine at Penn State Hershey.

from Covid-19 as someone his age who did not have these conditions." (ECF 416-1).[3] The risk factors identified by Dr. Gerard include Creek's reduced mobility from cervical and thoracic spine disease and related left hemiparesis, steroid-dependent asthma, hypertension, depression and anxiety, and the non-medical factors of race (African-American) and gender (male). According to Dr. Gerard, Creek's pulmonary function tests show a dramatic reduction in breathing capacity, and he would be at high risk for respiratory complications if he contracts COVID-19. (*Id.*). On the other hand, the records from CTF show that Creek has been receiving regular temperature checks since March 26, 2020, when it appears he was placed on quarantine for possible exposure to COVID-19, and all results have been normal with no other symptoms noted. It also appears that his prescribed medications, including those for asthma, have been provided.

The risks to Creek based on his medical conditions must be evaluated in the context of the current conditions at CTF. These are detailed in a comprehensive report and recommendations prepared by the amici appointed by Judge Kollar-Kotelly in connection with the class action litigation against CTF and the D.C. Jail generally. The plaintiffs allege violations of the Fifth and Eighth Amendments based on conditions of confinement related to the virus. In issuing a temporary restraining order, the judge made a preliminary finding of "unreasonable risk" to the plaintiffs' health and ordered certain corrective actions to be implemented immediately. *Banks v. Booth*, No. CV 20-849(CKK), 2020 WL 1914896, at *7, *13–14 (D.D.C. Apr. 19, 2020) (the report submitted by the amici is attached to the opinion). Of particular concern were the conditions in the isolation cells where detainees who had tested positive were placed. *Id.* at *10. Corrective actions include expediting the triage process for sick call requests on the non-quarantine unit, better documenting sick calls and urgent care calls, improving

---

[3] Dr. Gerard does not attempt to quantify the risk faced by a 39-year-old without Creek's medical conditions.

COVID-19 related education and training, improving the conditions of inmates on isolation status and ensuring they have consistent and reliable access to legal calls, and ensuring all personal protective equipment issued is properly fitted. *Id.* at *13–15. The court also recommended that D.C.'s Department of Corrections ("DOC") retain a registered sanitarian. *Id.* at *14. Finally, the D.C. government reported as of April 27, 2020, that 127 individuals in the custody of the DOC have tested positive for COVID-19.[4] Of that number, 75 have recovered. One detainee and one correctional officer have died as a result of COVID-19. According to the court in *Banks v. Booth*, as of April 4, 2020, the rate of infection in DOC facilities was over seven times the rate of infection in the D.C. population generally. *Banks*, 2020 WL 1914896, at *6.

Notably, however, Judge Kollar-Kotelly did not order the release of any detained individuals at this time. *Id.* at *13. Obviously that may change, perhaps depending on the degree of progress that is made by Jail officials in implementing the ordered improvements.[5] But implementation of her Order should eventually alleviate the risks cited and heavily relied on by Creek. *See United States v. Sagastume-Galicia*, No. CR 20-40 (BAH), 2020 WL 1935555, at *5 (D.D.C. Apr. 22, 2020) (expressing confidence that the DOC will do everything it can to comply with the Order).

In summary, while the risk itself remains extremely hard to quantify, the evidence presented to the court demonstrates an increased risk to Creek of contracting the virus if he remains at CTF. In whatever setting he might contract the COVID-19 disease, he has a greater

---

[4] Updated COVID-19 information can be found at https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data (last accessed April 28, 2020). According to the amici report in *Banks v. Booth*, the central detention facility at the D.C. Jail has around 1020 inmates, and CTF has around 400 inmates. Report, *Banks*, 2020 WL 1914896, at *17–18.
[5] An assessment of the constitutionality of conditions at CTF is not before the court on this remand order.

risk of serious illness or death than another individual his age who does not have his existing medical conditions.

Under the Fourth Circuit's remand order, the court is next directed to address whether that risk, balanced against the other Bail Reform Act factors,[6] rises to the level of a compelling reason for temporary release under 18 U.S.C. § 3142(i). That statute provides that:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

The parties have not cited any Fourth Circuit case analyzing § 3142(i). Several district courts have applied § 3142(i) recently, however, in the context of COVID-19. *See, e.g., United States v. Wilburn*, No. 2:18-CR-115, 2020 WL 1899146 (W.D. Pa. Apr. 17, 2020); *United States v. Green*, No. 1:19-CR-00539-CCB-1, 2020 WL 1873967 (D. Md. Apr. 15, 2020); *United States v. Boatwright*, No. 2:19-CR-00301-GMN-DJA, 2020 WL 1639855 (D. Nev. Apr. 2, 2020); *United States v. Lee*, No. 19-CR-298 (KBJ), 2020 WL 1541049 (D.D.C. Mar. 30, 2020); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kan. Mar. 25, 2020); *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020); *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020). The defendant bears the burden of demonstrating a compelling reason. *See Clark*, 2020 WL 1446895, at *2. Outside of the context of a need to consult with counsel, which is not at issue here, most of the opinions granting temporary release have done so where the defendant demonstrated a terminal illness or particularly severe medical condition that could not be adequately treated within the correctional system. *See id.*; *Boatwright*, 2020 WL 1639855, at *4. While some courts have

---

[6] The factors to be considered under the Bail Reform Act are: the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

applied the four-factor test set forth in *Clark*, 2020 WL 1446895, at *3, *see Boatwright*, 2020 WL 1639855, at *5; *Green*, 2020 WL 1873967, at *3, *United States v. Santana*, No. 1:19-CR-251, 2020 WL 1692010, at *4 (M.D. Pa. Apr. 7, 2020), and others have not, *see Wilburn*, 2020 WL 1899146, all have recognized that, in deciding whether temporary release is warranted, the court must still consider the danger to the community or risk of flight that would be posed by the defendant's release as analyzed under the factors set forth in 18 U.S.C. 3142(g).[7] Here, the Fourth Circuit has directed the court to "balance" the severity of the risk to the defendant against the other Bail Reform Act factors.

Two recent cases in this district provide helpful guidance. A court in this district recently considered a request for temporary release under § 3142(i) by a pretrial detainee housed at CTF, which was denied. *United States v. Lee*, No. CV ELH-19-159, 2020 WL 1974881 (D. Md. Apr. 24, 2020). The court weighed Lee's medical conditions (obesity, high blood pressure, and depression, although he told pretrial services he was in excellent physical health with no medical problems reported) and the circumstances at CTF against his alleged conduct (sex trafficking and production of child pornography), the weight of the evidence, and his prior violation of pretrial release during which he contacted potential witnesses for sex. *Id.* at *1–2, *6–8. Balancing the factors, the court found that Lee had not shown a "compelling reason" for temporary release under § 3142(i). *Id.* at *8.

In *United States v. Keaton*, also in this district, the court granted the temporary release of a detainee who was housed at CTF while awaiting sentencing. (TDC-18-0215, Memorandum Order, ECF 84 (D. Md. April 23, 2020)). Keaton had pled guilty to possession of a firearm by a convicted felon and possession with intent to distribute controlled substances. *Id.* at 1. Because

---

[7] As a starting point, this court cited to *Clark* in directing the parties to brief the issue of temporary release. Counsel appropriately have cited to numerous other cases in their briefing.

he had already pled guilty, his request was governed by 18 U.S.C. § 3145(c), which authorizes release for "exceptional reasons." *Id.* at 2. The court found an exceptional reason because of the conditions at CTF/D.C. Jail, as documented in *Banks*, and Keaton's asthma and hypertension, which placed him in a high-risk category should he contract COVID-19. *Id.* at 3–6. Further, as to the danger to the community, the firearms were found in a closet in a residence, there was no evidence Keaton used firearms as part of criminal behavior, and he had no adult convictions for a crime involving the use of violence. *Id.* at 6.

It may also be helpful to consider two recent cases from the U.S. District Court for the District of Columbia involving pretrial detainees in D.C. Jail. In *United States v. Dhavale*, the court granted a request for temporary release from a detainee housed at CTF. No. 19-MJ-00092, 2020 WL 1935544, at *3–4 (D.D.C. Apr. 21, 2020). The court considered the nature of the defendant's alleged conduct (attempting to have sex with a minor), the evidence against him, his history and characteristics (no prior criminal history and strong ties to the community, but employed a "troubling level of sophistication" to hide his criminal conduct), and the danger to the community, finding that the § 3142(g) factors weighed in favor of pretrial detention. *Id.* The court, however, found that Dhavale had presented a compelling reason for temporary release, due to his prediabetes and hypertension, putting him at a higher risk for a more severe illness from COVID-19, and the current conditions at the D.C. Jail, as detailed in *Banks*. *Id.* at *5–6. Further, he would be released to his wife, an appropriate third-party custodian. *Id.* at *5.

In *United States v. Thomas*, the court temporarily released the pretrial detainee Thomas to his sister's home. Thomas was charged with the armed robbery of a Dunkin Donuts, although the gun was later found to be inoperable. No. CR 17-194 (RDM), 2020 WL 1911558, at *2–3 (D.D.C. Apr. 20, 2020). It appears he had a prior firearm conviction and escape conviction. *Id.* at

*2. In December 2019, he was diagnosed with sarcoidosis, which is a multisystemic disorder that primarily affects the lungs and lympathic system. *Id.* at *3. At the D.C. Jail, he experienced general malaise, shortness of breath, nausea, and shivers. *Id*. The court stated that, if not for the pandemic, it would find that no conditions of release would reasonably assure the safety of the community. *Id.* at *7. But, considering the real and imminent threat that COVID-19 posed to Thomas's health, as well as Thomas's incentive to stay at his sister's home because of the risk of COVID-19 (therefore reducing the danger to the community), the court found that the threat to Thomas's health was a compelling reason not outweighed by countervailing factors. *Id.* at *8.

In balancing the risk to the pretrial detainee against the other Bail Reform Act factors, the courts in the above cases have placed great weight on the current conditions at CTF, as recounted in *Banks*, especially when the defendant shows an individualized and serious risk from COVID-19. Further, the cases also indicate that the balancing should consider the appropriateness of the third party custodian and whether the proposed living situation might mitigate the danger that the defendant poses to the community.

There is no dispute that the nature and circumstances of the offenses charged are serious, and the court will assume the government's evidence is strong. The parties dispute to what extent Creek's alleged conduct and criminal history indicates that he would engage in criminal conduct or pose a danger to the community if temporarily released. A significant factor in *Keaton* was that the guns were found in a closet at Keaton's residence, and there was no indication they were used as part of criminal behavior. (TDC 18-0215, Memorandum at 6). Here, there is evidence that Creek may have provided firearms to co-defendants who are charged with drug-trafficking offenses, so his involvement with firearms may be more significant than in *Keaton*. Creek also has previously violated supervised release, which he was on after his 2010 federal drug and

8

firearm convictions, when, in July 2014, he possessed marijuana.[8] On the other hand, he is not accused of personally using firearms in connection with the alleged conspiracy.

The danger that Creek may pose to the community if temporarily released is somewhat mitigated by his release plan. Creek's sister, who has agreed to let Creek stay at her home, is a reliable third party custodian. Creek initially requested to be temporarily released to his residence, where drugs and ammunition were previously found, which was a factor that the court considered when originally denying his request. Now, Creek proposes to be released to his sister, who lives outside of Baltimore City with her husband, her two children, and her mother. His sister and her husband are both employed full-time with a fire department, as a Lieutenant and Captain, respectively. Creek's sister has some medical training so she can help Creek with his medical issues. Further, the government alleges that the drug trafficking organization that Creek allegedly belonged to operated around the Darley Park area of Baltimore City. (ECF 364, Opp'n at 3). At his sister's home, Creek will be away from Baltimore City and the area where he was alleged to have engaged in criminal activity. It does not appear that Creek will have access to firearms at his sister's home. Still, the court acknowledges the government's concern that Creek allegedly coordinated firearm trafficking through the phone, and this could still be done at his sister's home. This possibility must be balanced against Creek's health risks at CTF.

As discussed above, the current conditions at CTF are such that Creek has an increased risk of contracting COVID-19 while in custody there, and the unusual severity of Creek's medical conditions are such that Creek would be at a higher risk for serious illness or death if he contracts COVID-19. The severity of the risk that COVID-19 poses to Creek must be balanced

---

[8] Creek was alleged to have violated his supervised release by possessing marijuana and MDMA and committing a home invasion with a knife, (No. CCB-13-585, ECF 5, Petition on Supervised Release), but he eventually pled guilty only to possession of marijuana and supervised release was revoked, (*id.*, ECF 25, Judgment on Violation of Supervised Release).

9

against the other Bail Reform Act factors. In particular, the court considers the danger Creek poses to the community, which may be mitigated by the reliability of Creek's third party custodian and the fact that her residence is outside of Baltimore City. On balance, Creek has demonstrated that the risk from the COVID-19 virus is a compelling reason for temporary release.[9] Should conditions at CTF improve, Creek's COVID-19 risk may no longer outweigh the danger he poses to the community. At this time, however, when the severity of the COVID-19 risk is balanced against the other Bail Reform Act factors, the risk rises to a compelling reason.

The statute provides for "temporary" release, not necessarily indefinite release. Accordingly, Creek will be released on the conditions to be set forth below and in the accompanying Order, but only for a period of ten weeks, during which conditions of confinement at pretrial facilities may improve and the risk to Creek may lessen. Creek may apply to the court for an extension no later than fourteen days prior to the expiration of the ten weeks, if he can demonstrate that he still has compelling reasons to remain on temporary release. *See U.S.A. v. Michaels*, No. SACR 16-76-JVS, 2020 WL 1482553 (C.D. Cal. Mar. 26, 2020). Otherwise, Creek is ordered to surrender to the United States Marshal's office at 101 West Lombard Street, Baltimore, MD, 21201, on July 13, 2020. Finally, release may be revoked prior to the ten weeks if there is any violation of the release conditions or if circumstances change.

---

[9] The court notes two recent decisions in this district denying temporary release, *United States v. Kamal Dorchy,* Criminal Case No. GLR-18-0172, 2020 WL 2041668 (D.M.D. April 28, 2020) and *United States v. Remarque*, No. CR PX-19-039, 2020 WL 1983927 (D. Md. Apr. 27, 2020). In *Dorchy,* there was evidence that the defendant sought to intimidate witnesses, which is not alleged here. 2020 WL 2041668 at *2. The risk that COVID-19 poses to Creek appears to be more severe than in *Remarque*, where the defendant had a mild case of COVID-19 and had since recovered. 2020 WL 1983927, at *3.

## CONCLUSION

For the reasons stated above, Creek has demonstrated that his risk from COVID-19, balanced against the other Bail Reform Act factors, rises to the level of a "compelling reason" for temporary release under 18 U.S.C. § 3142(i). The conditions of release will include being placed in third party custody, remaining in the house at all times except with prior approval from Pretrial Services, location monitoring, and complying with public health directives, all as more fully set forth in the Order to be issued separately. Release, which must take place at the U.S. Courthouse in Baltimore, will be delayed until Pretrial Services has verified that the defendant/third party custodian has obtained a smart phone to accommodate location monitoring and that transport from the courthouse to the custodian's residence has been arranged.

<table>
<tr><td>__5/1/20__<br>Date</td><td>__/S/__<br>Catherine C. Blake<br>United States District Judge</td></tr>
</table>